IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 5:19-CR-349 |
| | ) | |
| Plaintiff, | ) | SENIOR JUDGE DAN AARON POLSTER |
| | ) | |
| v. | ) | |
| | ) | |
| THOMAS G. O'LEAR, | ) | GOVERNMENT'S RESPONSE TO |
| | ) | DEFENDANT'S SENTENCING |
| Defendant. | ) | MEMORANDUM |

The United States of America, by and through undersigned counsel, hereby responds to Defendant's arguments concerning the disputed Guidelines issues in the final presentence report (R. 61) and the appropriate sentence to be imposed under 18 U.S.C. § 3553(a), as set forth in Defendant's sentencing memorandum (R. 63).

**I.   INTRODUCTION**

Defendant has two guidelines objections.  *First*, Defendant objects to 2 levels of the 18-level loss adjustment under U.S.S.G. § 2B1.1(b)(1).  While the government does not agree with many of Defendant's arguments construing this Guidelines provision, the government agrees that a 16-level increase should apply under the unique facts here.

*Second*, Defendant objects to 4 levels of increases under U.S.S.G. § 3A1.1(b) from his victimizing a large number of vulnerable individuals (2 levels added for a single vulnerable victim and another 2 levels added because there were a large number of such victims).  These objections are without merit.  Most of the victims of the identity theft scheme that undergirded Defendant's fraud were residents of skilled nursing facilities, many of whom resided at homes specifically reserved for individuals with developmental disabilities.  Defendant acknowledges

that they are victims under the Guidelines. He also does not dispute that there are a large number of such victims. Instead, he merely disputing that these victims were "vulnerable" within the meaning of U.S.S.G. § 3A1.1(b). Specifically, Defendant alternatively disputes that these victims were vulnerable to a fraud perpetrated on Medicaid and Medicare, and disputes that he made use of their vulnerability in stealing their identities. But Defendant's arguments run counter to the text of the Guidelines and the caselaw. The victims here were vulnerable to identity theft due to their "age [or] physical or mental condition" (or were "otherwise particularly susceptible to the criminal conduct"), and Defendant "knew or should have known" of this vulnerability. U.S.S.G. § 3A1.1(b) & n.2. That is all that is required. Defendant's contentions to the contrary rely on outdated, out-of-circuit case law, and should be rejected.

Accordingly, the correct offense level calculation for Defendant is as follows:

| 18 U.S.C. §§ 1347 and 1035: Healthcare Fraud and False Statements | | |
|---|---|---|
| Base offense level | 6 | § 2B1.1(a)(2) |
| Actual and intended loss of more than $1.5 million, but not more than $3.5 million | +16 | § 2B1.1(b)(1)(I) |
| 10 or more victims | +2 | § 2B1.1(b)(2)(A) |
| More than $1 million in loss to federal healthcare program | +2 | § 2B1.1(b)(7) |
| Sophisticated means | +2 | § 2B1.1(b)(10)(C) |
| Vulnerable victim | +2 | § 3A1.1(b)(1) |
| Large number of vulnerable victims | +2 | § 3A1.1(b)(2) |
| Abuse of private position of trust | +2 | § 3B1.3 |
| Attempt to obstruct justice (perjury) | +2 | § 3C1.1 |
| **Total Offense Level before Acceptance of Responsibility** | **36** | |
| No adjustment for acceptance of responsibility | | § 3E1.1, n.2 |
| **Final Offense Level** | **36** | |

As Defendant falls in Criminal History Category I, the applicable Guidelines range is 188 to 235 months (36/I) for his fraud convictions in Counts 1 – 11 and 15 – 26 (violations of 18 U.S.C. §§ 1347 and 1035), followed by a consecutive term of 24 months for his aggregated identity theft convictions in Counts 27 and 28 (violations of 18 U.S.C. § 1028A).

Finally, the facts and circumstances of the offense and the need for the sentence to reflect the seriousness of the crime and provide for deterrence support the imposition of a sentence at the high end of the Guidelines range.

## II. ARGUMENT

### A. THE APPLICABLE OFFENSE LEVEL IS 36.

#### 1. The loss was more than $1.5 million, but less than $3.5 million.

While the government concedes that the 16-level increase under U.S.S.G. § 2B1.1(b)(1) is appropriate, the government briefly notes its disagreement with Defendant's attempt to excise "intended loss" from the Guidelines. Defendant argues that defining "loss" to include "intended loss" in the application notes impermissibly creates a conflict between the notes and the word "loss" in the text of U.S.S.G. § 2B1.1. First, this contention is at odds with decades of precedent. Indeed, the very case on which Defendant relies itself cites with approval the "intended loss" provision of the U.S.S.G. § 2B1.1 application notes. *See United States v. Riccardi*, 989 F.3d 476, 481-82 (6th Cir. 2021).

Second, and more importantly, Defendant's contention is that the Guidelines text alone controls, but the text itself requires that offense level adjustments turn on the harms a defendant *intended*. Specifically, as relevant here, the Court must determine the offense level based on not only the "harm that *resulted* from [Defendant's] acts and omissions," but also "all harm *that was the object of such acts and omissions*." U.S.S.G. § 1B1.3(a)(3) (emphasis added). Accordingly, with that context, nothing about the commentary's provisions interpreting "loss" to include "intended loss" is contrary to *Riccardi* or any of the authorities cited therein. Similarly, there is no issue with an interpretive rule that, consistent with common sense, uses the fraudulent claims submitted as prima facie evidence of the loss that was the object of the defendant's acts and omissions.

3

Nonetheless, given the unique facts of this case and evidence in the record, the government would concede that both the actual and the intended loss here are more than $1.5 million but less than $3.5 million. As the Court is aware from the trial testimony here, Defendant was acutely aware of the reimbursement rates for Medicare and Medicaid, which is why he dramatically expanded the fraud when the reimbursement for portable x-ray transports increased substantially for Medicare and Medicaid in 2015. Given his knowledge of these reimbursement rates and the manner in which he focused this fraud exclusively on those programs, even seeking to exclude Medicare Part A and managed care patients, the facts of this case are unique. Accordingly, the government agrees that, on these facts, the loss that Defendant intended in submitting the many fraudulent bills here was the rate he knew Medicare and Medicaid would pay, as he clearly did not intend to obtain more than that amount.

It is not disputed that the actual loss here is $1,989,507. While the intended loss would also include additional amounts for a significant number of fraudulent *denied* claims that Defendant submitted, adding the payments he intended to receive on all of those claims would not bring the intended loss above $3.5 million. According, the government agrees that the correct loss adjustment is a 16-level increase.

    2.    <u>Vulnerable victim issues</u>

As the Sixth Circuit has explained:

> The Guidelines call for a two-level enhancement if the "defendant knew or should have known that a victim of the offense was a vulnerable victim." U.S.S.G. § 3A1.1(b)(1). A vulnerable victim is someone who "is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." U.S.S.G. § 3A1.1, cmt. n. 2.

*United States v. Olive*, 804 F.3d 747, 759 (6th Cir. 2015).

4

Contrary to Defendant's suggestions that Defendant must have sought out the vulnerability, based on out-of-Circuit precedent,[1] "the enhancement applies if the defendant knew or should have known of the victim's vulnerability, and the government need not prove that the defendant targeted a victim *because* of her vulnerability." *United States v. Lukasik*, 250 F. App'x 135, 138 (6th Cir. 2007) (emphasis in original) (citing *United States v. Brawner,* 173 F.3d 966, 973 (6th Cir. 1999)). What matters is that the victims were vulnerable, and the defendant actually or constructively knew of the vulnerability; selection of victims for their vulnerability to facilitate the crimes is not required (though it is an additional aggravating factor). *United States v. Graham*, No. 20-6430, 2021 WL 6071504, at *3 n.4 (6th Cir. Dec. 20, 2021). In *United States v. Mullet*, 822 F.3d 842 (6th Cir. 2016), for example, the Sixth Circuit affirmed the application of the enhancement because the testimony showed "the advanced age and serious illness of several victims," and the defendants' knowledge of this vulnerability was clear from the close relationships between the defendants and their victims. *Id.* at 851. It did not matter that the defendants had not chosen the victims because of their vulnerability or "that other victims suffered the same fate and were neither old nor sick." *Id.* at 851-52.

Nor is there any requirement that the victims at issue be victims of the offense of conviction. As Defendant has conceded, victims of relevant conduct can be vulnerable victims. The Sixth Circuit has so held on multiple occasions. *See United States v. Moon*, 513 F.3d 527, 541 (6th Cir. 2008) (citing *United States v. Gawthrop*, 310 F.3d 405 (6th Cir. 2002). Relatedly,

---

[1] Notably, the primary case on which Defendant relies, *United States v. Lee*, 973 F.2d 832, 834 (10th Cir. 1992), predates a substantial revision to the Guidelines, and so concerns a previous iteration of U.S.S.G. § 3A1.1, under which the enhancement applied if "an unusually vulnerable victim is made a target of criminal activity by the defendant." *See United States v. McCaster*, 333 F. App'x 970, 973 (6th Cir. 2009) (quoting U.S.S.G. § 3A1.1 n.1 (1994)). As the Sixth Circuit explained in *McCaster*, "the Sentencing Commission amended the application notes [in 1995] to delete the 'made a target' language, replacing it with the 'knows or should have known' language" found in the current Guidelines. *See id.* at 973 (citation omitted).

5

even when financial charges are involved, there is no requirement that every victim be financially harmed. *See also United States v. Webster*, 615 F. App'x 362, 364 (6th Cir. 2015) ("In ordinary usage, a victim is someone 'tricked, duped, or subjected to hardship,' or someone 'used or taken advantage of.'"). Identity theft victims are victims, and the only question is whether Defendant knew (or should have known) that they were vulnerable.[2]

Combining these principles, Defendant's argument—that the vulnerability of these victims is insufficient because it was their status as Medicaid or Medicare beneficiaries that was central to the scheme—fails. In *United States v. Myree*, 89 F. App'x 565, 567 (6th Cir. 2004), the Defendant was convicted of possessing firearms and ammunition as a felon, but his relevant conduct included an armed robbery with vulnerable victims. *Id.* ("the children were victims of conduct relevant to the offense of conviction and were properly deemed to be vulnerable based on their ages"). A possession offense has no victim, but shortly before being found with the firearm, he had committed the robbery as part of his relevant conduct. *Id.* at 566-67. Again, the fact that the defendant had not sought to rob the children did not change that fact that he became aware children were present and proceeded, making the children known victims, which was all that was required for the enhancement to apply. *Id.* at 567. So too here, the enhancement applies because Defendant was well aware of the vulnerability of his victims.

Courts regularly find that nursing home residents, the elderly, and the disabled are classic cases of vulnerable victims. In *Olive*, for example, the fact that the victims of a financial fraud had an average age of 77 was enough to support the enhancement. 804 F.3d at 759. In *United*

---

[2] Although not material to whether these individuals were vulnerable, Defendant minimizes the identity theft at issue here as concerning only the patients' "names." This is far from accurate. All of these patients' most confidential identifiers, such as their social security numbers and member numbers, were used. For many of them, their private medical information was also invaded. In performing his cover-up, Defendant used countless x-ray images of the bodies of patients, including images showing patients' genitals.

*States v. Etoty*, 679 F.3d 292, 295 (4th Cir. 2012), the court found that a disabled person "receiving a fixed income of Social Security benefits" qualified as vulnerable to identity theft because she "might be less inclined to take the sort of precautions against fraud and identity theft that are necessary for someone actively engaged in the job market." In *United States v. Ealy*, 682 F. App'x 432, 438 (6th Cir. 2017), the court combined all of these forms of victims as vulnerable to identity theft in a fraud scheme, as the defendant there stole the identities of "the elderly, the young, nursing home patients, and disabled individuals," and it did not matter that they had not suffered a financial loss.

     Here, the evidence has shown that all or nearly all of the victims were residents in skilled nursing facilities, which were reserved primarily for the elderly, but also some disabled patients, all of whom could not care for themselves, and could not manage their own day-to-day affairs. Trial witnesses Schnabel and Neibecker testified that their facilities—The Meadows and Deepwood/Lake County Board of Developmental Disabilities, respectively—were specifically reserved for patients with developmental disabilities, making them particularly unsuspecting victims of identity theft—in other words, unusually vulnerable. They would not be able to recall how many x-rays they had experienced or of what body parts. And they were the last people who would review an "Explanation of Benefits" form if they received one. Defendant knew his patient population, and he preyed upon them.

     For this reason, Defendant's argument also fails on the facts because the evidence suggests that he did target skilled nursing facility residents. The trial here focused entirely on skilled nursing facilities, but Defendant provided x-ray services at other facilities, such as a local hospital. He could have included those patients as identity-theft victims in this fraud, but he

chose not to, as such patients are far more likely to actually review the bills submitted in their names.

      B.      A GUIDELINES SENTENCE IS SUFFICIENT BUT NOT GREATER THAN NECESSARY UNDER 18 U.S.C. § 3553.

The government submits that Defendant's conduct here was outrageous. It was nothing more than greed layered on top of greed, gratuitously undertaken primarily to fund his building of a new mansion, complete with a pool, as well as landscaping that alone cost more than most homes in Cleveland, with more outbuildings planned if law enforcement had not intervened.

It is also clear that Defendant's conduct here—profiting from dishonesty—is far from out of character. He committed this fraud over years. He continued to lie to his clients after the search warrant, even when confronted about his ban from Medicare. He then sought to evade that bad by covertly operating under a new name. He then found another job at Company 1, but went back to lying to line his pockets, making up visits to Company 1's clients to obtain mileage reimbursements by fraud, while avoiding doing any actual work. When confronted about it, he lied to Company 1. At his arraignment, he lied about not working. Perhaps worst of all, when faced at trial with a mountain of evidence that showed he was the sole perpetrator of this wide-ranging fraud, Defendant did not even have the decency (or wisdom) to invoke his right to remain silent. Not only did he falsely deny his guilt, he had the nerve to tell this Court and a jury of his peers that the person responsible for the fraud was an employee who Defendant had fired as soon as law enforcement confronted him about his fraud—and who Defendant had paid a modest hourly wage, totaling around $20,000 per year, while Defendant was bringing in hundreds of thousands of dollars per year and building a mansion to his specifications.

The government recognizes that the average sentence for an offender with offense level 36 in criminal history category I is 121 months (before the mandatory 24-month consecutive

8

term).³  The government submits however that Defendant's conduct, and what it reveals about his character, has demonstrated that a downward variance is unwarranted here.  There would be no unwarranted disparity in imposing a guidelines sentence of 235 months for the fraud, plus 24 months for the aggravated identity theft.  Each offense level adjustment here is well supported, and every month that the Guidelines recommend is richly deserved and sufficient but not greater than necessary to serve the purposes of sentencing under 18 U.S.C. § 3553(a).

In addition to the details of the offense and Defendant's history and characteristics, the government submits that a significant sentence of imprisonment—within the Guidelines range—is particularly important "to reflect the seriousness of the offense," "to provide just punishment for the offense," and "to afford adequate deterrence to criminal conduct." *Id.*  Deterrence is particularly important given the harm to government healthcare programs that are meant to safeguard the most vulnerable in society, and the temptation to profit by fraud that these programs represent.

The Sixth Circuit has recognized that, because "economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." *United States v. Peppel*, 707 F.3d 627, 637 (6th Cir. 2013) (quoting *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006)).  Indeed, ensuring adequate punishment for, and deterrence of, white collar economic crime was one of the central motivators behind the creation of the Guidelines. *See United States v.* Musgrave, 761 F.3d 602, 609 (6th Cir. 2014) (collecting citations).  Downward variances that are not sufficiently justified by the particular circumstances of the case that set it apart from other white

---

³ See https://jsin.ussc.gov/analytics/saw.dll?Dashboard.

collar crime cases with similar Guidelines ranges undermine this key purpose of sentencing under 18 U.S.C. § 3553.

    C.    THE COURT SHOULD ORDER RESTITUTION FOR THE UNDISPUTED ACTUAL LOSS.

As noted above, there is no dispute that the actual loss here has been established as $1,989,507.  The government will provide a breakdown of this amount to Probation, so that it can be apportioned among Medicare, Medicaid, CareSource, and the other Medicaid managed care organization victimized here.

**III.**    **CONCLUSION**

For the reasons set forth above, the vulnerable victim enhancements apply, and Defendant's Guidelines range is therefore 188 to 235 months (36/I).  For the reasons set forth above and in the government's sentencing memorandum, and for all those to be offered at the sentencing hearing, the government submits that a sentence at the high end of the range is appropriate, such that the Court should impose a total of 259 months of imprisonment.

        Respectfully submitted,

        MICHELLE M. BAEPPLER
        First Assistant United States Attorney

By:    /s/ Elliot Morrison
        Elliot Morrison (OH: 0091740)
        Assistant United States Attorney
        United States Court House
        801 West Superior Avenue, Suite 400
        Cleveland, OH 44113
        (216) 622-3919
        Elliot.Morrison@usdoj.gov